FILED
United States Court of Appeals
Tenth Circuit

April 22, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

WILBUR DELMAS WHITEHEAD,
a/k/a W.D. Whitehead,

Defendant-Appellant.

No. 13-6095
(D.C. No. 5:11-CR-00273-L-1)
(W. Dist. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **SEYMOUR**, and **HOLMES**, Circuit Judges.

Wilbur Delmas Whitehead was convicted of six out of ten counts of mail

fraud in violation of 18 U.S.C. § 1341, and sentenced to forty-six months. He

appeals, and we affirm.

**I**

Because the jury found Mr. Whitehead guilty on six counts, we set forth the

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, or collateral estoppel. Although the
court generally disfavors the citation of an order and judgment, it may be cited for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

evidence presented at trial "in the light most favorable to the government."

*United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (internal quotation

marks omitted). Mr. Whitehead operated Whitehead Production Equipment

(WPE), an oil field supply company in Stinton, Texas. In December 2008, WPE

entered into a contract with Chesapeake Energy, an oil and natural gas company

in Oklahoma City, to deliver a specific type of equipment used in oil and gas

fields known as a "Fat Boy" separator.[1] Fat Boy separators were used to separate

liquid from gas and essentially enable the separation of gas at a wellhead.

Chesapeake has an office in Cleburne, Texas, and during the relevant time

period operated over 1,200 wells in North Texas in an area known as the Barnett

Shale region. Because of certain municipality restrictions on the height of

separators, Chesapeake began using Fat Boy separators for all new wells in the

Barnett Shale region in January 2009. A Fat Boy package consisted of the

separator mounted on a skid and the associated piping.

In 2008, WPE entered into an agreement with Cash Flow Experts, a

factoring company. Under this agreement, WPE would send an original invoice

to Cash Flow Experts, who would pay WPE a certain percentage of the invoice

and then send the original invoices to Chesapeake for collection. Once the

invoices were paid, usually in three months, Cash Flow Experts would keep as its

---

[1] Prior to this agreement, WPE provided Chesapeake with a different type
of separator known as a "tall skinny" separator.

fee the difference between the amount it had paid to WPE and the total amount received from Chesapeake.

In November 2008, K.W. started working as a construction foreman in Chesapeake's Cleburne office. His job included ordering and installing the equipment necessary to finish wells in the region so Chesapeake could sell gas. K.W. met with Mr. Whitehead that November to inspect two WPE Fat Boy separators and determined changes needed to be made to the separators before Chesapeake could use them. He thought Mr. Whitehead would make the modifications and contact him, but Mr. Whitehead did not do so. Mr. Whitehead finally called in February or March 2009, after K.W. sent emails inquiring about where he was on the Fat Boys. Mr. Whitehead said he had the materials to make ten separators. At this point, K.W. already had four other vendors making separators but agreed to use the ten separators if WPE built them.

Chesapeake fired K.W. in April 2009 for improper sexual misconduct with an employee of a vendor. They subsequently replaced him in July 2009 with Glen Stetson. Part of Mr. Stetson's duties included approving more than 1,000 invoices that had accumulated since K.W.'s termination. Some of these were WPE invoices for Fat Boy separators. Mr. Stetson became concerned when he was still seeing invoices with K.W.'s signature in the fall of 2009, including invoices dated after K.W. was terminated. He attempted to call Mr. Whitehead over a period of several weeks to resolve the issue, but Mr. Whitehead did not

return his calls until February 23, 2010. Mr. Stetson asked Mr. Whitehead to provide serial numbers for the Fat Boy separators at issue. Mr. Whitehead said he would do so immediately but he did not call back.

When Cash Flow Experts did not receive payments from Chesapeake after the first part of 2009, it asked Mr. Whitehead why Chesapeake was not paying the invoices. He assured them the equipment had been manufactured and delivered. Cash Flow Experts asked Mr. Whitehead numerous times for documentation, but he told them his secretary was sick from a difficult pregnancy and he could not provide the documents until she returned to work. Cash Flow Experts eventually contacted Chesapeake in February 2010 and learned that K.W. had been terminated ten months earlier. It again contacted Mr. Whitehead, who continued to claim K.W. had signed the invoices. In all, Cash Flow Experts paid Mr. Whitehead $295,000 for WPE invoices for which it was never paid by Chesapeake.

In March 2010, Mr. Whitehead provided Mr. Stetson serial numbers for the Fat Boy separators over the phone. He also told Mr. Stetson that although he occasionally delivered some of the separators to the well locations, he delivered them to the Midcon yard most of the time. Mark Reinhardt, a member of Chesapeake's security department, visited the well sites listed on the suspect invoices and confirmed that no WPE Fat Boy separators were present. This was also confirmed by another employee who worked on the sites and checked the

equipment at each site daily. Nor were any of the WPE Fat Boy separators located at the Midcon yard. In addition, between September 2009 and February 2010, Chesapeake had an outside auditor do an inventory check of the more than 1,000 wells managed by the Cleburne office. Although Chesapeake had paid over $800,000 for twenty-three WPE Fat Boy separators, the auditor could not locate the separators at issue in Chesapeake's inventory. In fact, the only separators Chesapeake was unable to locate were those invoiced by WPE.

On April 6, 2010, Mr. Stetson, Mr. Reinhardt, and two other Chesapeake employees visited Mr. Whitehead at his business, where they found rusted and incomplete shells of Fat Boy separators. Mr. Whitehead claimed that it was up to Chesapeake and not WPE to issue serial numbers for separators, contradicting his earlier statements in which he provided serial numbers for the suspect invoices.[2] Mr. Reinhardt asked Mr. Whitehead to provide paperwork showing the Fat Boy separators had actually been manufactured and delivered, but Mr. Whitehead gave him the same excuse—he had to wait until his secretary returned to work. When Mr. Reinhardt asked Mr. Whitehead if it was possible the separators had not been delivered, he replied "I sure hope not." Aple. Supp. App. at 128. Mr. Whitehead agreed to meet with the Chesapeake employees the next day, but when they arrived the business was locked up and Mr. Whitehead was gone. No Fat Boy

---

[2] Mr. Stetson testified that the manufacturer, not Chesapeake, issues serial numbers for equipment.

separators associated with the suspect invoices were ever found.

On September 19, 2011, almost a year before Mr. Whitehead was indicted in this case, Chesapeake obtained a civil judgment against him in federal court in Texas. *See Chesapeake Operating, Inc. v. Whitehead*, No. C-10-301, 2011 WL 4372486, at *2-8 (S.D. Tex. Sept. 19, 2011). After Mr. Whitehead declined to participate in discovery or provide a defense, the court took evidence and granted damages against him in excess of 3.8 million dollars. *See id.* at *4-5 (finding Mr. Whitehead never delivered any of the Fat Boy separators and awarding Chesapeake and Cash Flow Experts compensatory and exemplary damages).

At his criminal trial, Mr. Whitehead claimed the separators had been delivered to Chesapeake and must have been either lost or stolen. However, Mark Martin, who worked as the WPE shop foreman, testified WPE started building the Fat Boy separators but never finished. K.W. testified he never saw any WPE Fat Boy separators delivered and did not sign any of the invoices in question. The government presented evidence that K.W. did not return to Chesapeake's Cleburne office after his termination in April 2009 and therefore was not available to sign most of the invoices, which were dated after he left. In addition, L.F., the Chesapeake employee whose name appeared on the fraudulent invoices as ordering the Fat Boy separators, testified he worked for Chesapeake in another capacity, which did not include ordering separators, during the time the suspect

WPE invoices were made.[3]  Evidence at trial also showed that companies hired to install separators for Chesapeake never received or installed any WPE Fat Boy separators related to the suspect invoices.

Chesapeake required all separators to be manufactured under the standards required by the American Society of Mechanical Engineers, which include outside inspections and the creation and retention of construction and inspection records. Testimony at trial confirmed that the company WPE had contracted with to perform these services had conducted no inspections for WPE in 2009.  The jury convicted Mr. Whitehead of six counts of mail fraud.

## II

Mr. Whitehead first contends his Sixth Amendment right to confrontation was violated when the district court limited his cross-examination of K.W. and L.F.  Although the jury was informed that both men had been terminated by Chesapeake, the court prohibited in-depth questioning concerning why they were fired, determining that the terminations were unrelated to any issue in the criminal trial and that under Fed. R. Evid. 403 any potential relevance was outweighed by confusion it would cause the jury.  Mr. Whitehead argues that both K.W. and L.F. had a strong motivation to lie in favor of Chesapeake because they

---

[3] Chesapeake fired L.F. in March 2010 for misconduct that involved using Chesapeake vendors for personal purposes without disclosing that fact to Chesapeake or paying the vendors.

were not prosecuted for the misconduct leading to their termination, presumably because of their willingness to testify for the government on Chesapeake's behalf. "We review de novo whether restrictions on cross-examination violated a defendant's Sixth Amendment confrontation rights." *United States v. Oliver*, 278 F.3d 1035, 1041 (10th Cir. 2001).

Ensuring the opportunity to cross-examine witnesses is a fundamental purpose of the confrontation guaranteed by the Sixth Amendment. *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986). While "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 679 (emphasis in original) (internal quotation marks omitted).

Moreover, a violation of a defendant's constitutional right to confrontation is subject to harmless error analysis. *United States v. Sarracino*, 340 F.3d 1148, 1167-68 (10th Cir. 2003) (erroneous limitation of defense questioning of witness regarding reason for employment termination held harmless). To determine whether an error was harmless beyond a reasonable doubt, we must consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted," and "the overall strength of the prosecution's

-8-

case." *Id.* (internal quotation marks omitted). Even assuming the district court erred by not allowing Mr. Whitehead to cross-examine K.W. and L.F. concerning the reasons for their termination by Chesapeake, our review of the record convinces us that any error was harmless.

First, it is arguable whether either witness's testimony was critical to the government's case. Although L.F.'s name appeared on the WPE invoices as the employee who ordered the Fat Boy separators, Mr. Stetson testified that L.F. worked in an entirely different capacity at Chesapeake during 2009, and was thus not involved in ordering separators. And although Mr. Whitehead contends K.W.'s testimony that he did not sign the invoices at issue was crucial because he was the only witness to so testify, the jury found Mr. Whitehead guilty of only those counts of the indictment that involved invoices allegedly signed by K.W. after his termination.

Most significantly, the strength of the government's case against Mr. Whitehead was substantial and supported by ample evidence from other witnesses. As set forth above, there is evidence the separators in counts five through ten were never completed, delivered, or installed at the well locations listed on the invoices or at any Chesapeake well sites within the Barnett Shale region. The evidence also showed that Mr. Whitehead changed his story about the serial numbers and could not provide any documentation concerning the construction, the serial numbers, or required inspections. Accordingly, even

assuming Mr. Whitehead's right to confrontation was violated, we conclude the error was harmless beyond a reasonable doubt.

Mr. Whitehead also contends the district court erred by not granting his motion for a change of venue based on his claim that the jury pool was tainted by the fact that Chesapeake is headquartered in Oklahoma City. We review this issue for an abuse of discretion, giving "great deference to the trial court's exercise of its discretion." *Stafford v. Saffle*, 34 F.3d 1557, 1565 (10th Cir. 1994). The district court's "decision is entitled to a presumption of correctness and will not be overturned unless there is manifest error." *Id.* (internal quotation marks omitted). A defendant must show an "irrepressibly hostile attitude pervaded the community," precluding a fair and impartial jury. *Id.* at 1566 (internal quotation marks omitted). Mr. Whitehead has failed to do so—there is simply no record evidence to support his claim of jury prejudice.

Mr. Whitehead contends we should presume prejudice because of the pervasiveness of Chesapeake in the Oklahoma City community and because this is the type of extreme case where the Supreme Court stated prejudice should be presumed. *See Skilling v. United States*, 130 S. Ct. 2896, 2915 (2010). The Court in *Skilling* set forth four factors relevant to a determination of presumptive prejudice: "the size and characteristics of the community in which the crime occurred," the nature of the publicity surrounding the case, the time between the crime and the trial, and the outcome of the case. *See id.* at 2915-16. Here, all

-10-

four factors weigh against Mr. Whitehead. The Western District of Oklahoma has a large jury pool,[4] and Mr. Whitehead provided no evidence of any media coverage of the case. The trial occurred three years after the criminal charges against Mr. Whitehead, and although the jury convicted him of counts five through ten, it acquitted him on counts one through four. This is not the type of case supporting a presumption of prejudice and a change of venue.

Mr. Whitehead next challenges the exclusion of evidence by the district court. "We ordinarily review evidentiary rulings for abuse of discretion, but to the extent Defendant asserts the exclusion of evidence violated his constitutional rights, we review the ruling de novo." *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012). "[W]e will reverse a district court's decision excluding evidence if, but only if, the proffered evidence is both relevant and material . . . ." *United States v. Hernandez-Hernandez*, 519 F.3d 1236, 1238-39 (10th Cir. 2008).

Mr. Whitehead contends the district court's exclusion of evidence regarding the civil judgment Chesapeake obtained against him violated his constitutional right to present a complete defense and his right to confront several witnesses with evidence to show the jury their bias and interest in the outcome. *See*

---

[4] The Western District of Oklahoma is comprised of forty counties. *See United States District Court for the Western District of Oklahoma*, www.okwd.uscourts.gov/courtinfo.htm (last visited Feb. 19, 2014).

*DeChristopher*, 695 F.3d at 1095-96 ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)) (internal quotation marks omitted)). He argues the district court's evidentiary rulings prevented him from showing (1) the close collaboration between Chesapeake and the FBI and (2) the bias and motivation of certain of the government's witnesses who, he claims, had a financial stake in the outcome.

We agree with the district court that the evidence Mr. Whitehead sought to admit concerning the civil judgment was not relevant or material because it would have no tendency to prove or disprove any issue before the jury in the criminal case. In any event, Mr. Whitehead fully explored at trial the fact that Chesapeake provided considerable information that was helpful to the FBI. Moreover, because the civil judgment was entered in favor of Chesapeake and Cash Flow Experts before Mr. Whitehead's criminal trial began, the criminal case's outcome in no way affected Chesapeake's or Cash Flow Expert's ability to collect on the civil judgment.

Mr. Whitehead also claims the district court abused its discretion by excluding a threatening voice message a defense witness, Eddie Galvan, received shortly before trial to discourage him from testifying, and by excluding a news

-12-

clip video allegedly showing that Mark Martin, WPE's shop foreman and a government witness, was involved in fraudulent behavior. We disagree.

The district court was well within its discretion in excluding the anonymous phone call made to Eddie Galvan, where there was no evidence to show who made the call. With respect to Mr. Martin, the court allowed Mr. Whitehead to cross-examine him concerning his allegedly fraudulent business practices so the issue of Mr. Martin's alleged fraudulent behavior and its impact on his credibility was before the jury without introduction of the video clip. As the district court correctly ruled, Fed. R. Evid. 608(b) prohibits the admission of extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b).

Mr. Whitehead next contends the district court erred in refusing to instruct the jury on witness tampering with respect to the alleged "threats" made to Mr. Galvan by a federal agent. We review a district court's refusal to give a jury instruction for abuse of discretion. *United States v. Prince*, 647 F.3d 1257, 1265 (10th Cir. 2011). The proffered jury instruction was only relevant as it related to the issue of witness credibility, which was covered in a separate instruction. Morever, we agree with the district court's statement that "nothing that was said prevented Mr. Galvan . . . from certainly testifying freely." Aplt. App. vol. 2B at 378-79. Accordingly, the district court did not abuse its discretion.

Finally, Mr. Whitehead contends the alleged errors amounted to cumulative

error necessitating reversal.  "Cumulative-error analysis applies where there are two or more actual errors" but does not apply to "the cumulative effect of non-errors."  *Moore v. Gibson*, 195 F.3d 1152, 1175 (10th Cir. 1999) (internal quotation marks omitted).  The analysis is inapplicable here where we have determined that the one arguable error was harmless given the substantial evidence of Mr. Whitehead's guilt.

AFFIRMED.

ENTERED FOR THE COURT


Stephanie K. Seymour
Circuit Judge