FILED
United States Court of Appeals
Tenth Circuit

September 14, 2012

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

TIM DeCHRISTOPHER,

     Defendant-Appellant.

No. 11-4151

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH
(D.C. No. 2:09-CR-00183-DB-1)**
_____

Ronald James Yengich, Yengich, Rich & Xaiz, (Elizabeth Hunt, Elizabeth Hunt LLC, and Patrick A. Shea, Patrick A. Shea P.C., with him on the brief), Salt Lake City, Utah, for Defendant-Appellant.

Dave Backman, Assistant United States Attorney (David B. Barlow, United States Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.
_____

Before **BRISCOE**, Chief Circuit Judge, **BALDOCK**, and **HOLMES**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

Defendant Tim DeChristopher entered a Bureau of Land Management (BLM) oil and gas lease auction in Salt Lake City, Utah, by representing he was a bidder. His purpose was to disrupt the auction and call attention to the potential environmental harms

of drilling on the leases. He proceeded to drive up the auction prices and ultimately won almost $1.8 million in bids, for which he was unable to pay. A jury convicted Defendant of interfering with the provisions of Chapter 3A of the Federal Onshore Oil and Gas Leasing Reform Act, in violation of 30 U.S.C. § 195(a)(1), and making a false statement or representation in violation of 18 U.S.C. § 1001.[1] He now appeals, raising eight separate issues related to his conviction. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I.

Federal law requires BLM offices in each state with eligible lands to auction off oil and gas leases on a quarterly basis. 30 U.S.C. § 226(b)(1)(A). At these auctions, the minimum bid is two dollars per acre, 43 C.F.R. § 3120.1-2(c), but the amount of the winning bid can vary significantly. In addition to the final auction price, successful bidders must pay an annual rental of $1.50 per acre per year for the first five years of the lease ($2 per acre per year thereafter) and pay a royalty of 12.5 percent on the oil or gas produced from the lease. 30 U.S.C. § 226(b)(2)(A)(i), (d).

In December 2008, the BLM office in Salt Lake City, Utah, held an auction for leases on 131 parcels of BLM-managed land located in Utah. The decision to allow

---

[1] The first of these statutes makes it "unlawful for any person . . . to organize or participate in any scheme, arrangement, plan, or agreement to circumvent or defeat the provisions of this chapter [Title 30, Chapter 3A] or its implementing regulations." 30 U.S.C. § 195(a)(1). The second statute subjects to a fine or imprisonment "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a).

drilling on these parcels sparked significant controversy, and by the date of the auction individuals had filed administrative challenges to all 131 parcels. Additionally, two days before the auction, environmental groups filed suit in federal court seeking a temporary restraining order to prevent leases from issuing on seventy-seven of the parcels. See S. Utah Wilderness Alliance v. Allred, 2009 WL 765882 (D.D.C. January 17, 2009) (unpublished). Despite these challenges, the auction went forward as planned. On the day of the auction, demonstrators gathered outside the BLM office in protest.

Defendant, a student at the University of Utah, arrived at the BLM office intending to participate in the protest. He walked from one end of the protest to the other, and then entered the BLM office. He soon decided protesting would not have much of an impact and wanted to "take stronger action to really waive [sic] that red flag and see what was going on in there." Appellant's App., vol. II at 802. Defendant therefore entered the building, where a BLM employee asked him if he was a bidder, observer, or member of the media. Defendant said he was a bidder. The employee told Defendant to complete and sign a bidder registration form. Defendant did so, sitting at the registration table for approximately two or three minutes. By signing the form, Defendant "certif[ied] that any bid submitted by the undersigned . . . is a good faith intention . . . to acquire an oil and gas lease on the offered lands." Id. at 406. The form also notified him, "It is a crime under 18 U.S.C. 1001 and 43 U.S.C. 1212 for any person to knowingly and willfully make any false, fictitious or fraudulent statements or representations as to any matter within its [sic] jurisdiction." Id. The BLM employee then gave Defendant a bidder paddle, and Defendant proceeded to the auction room.

About twenty minutes into the auction, Defendant began bidding on parcels. After driving up prices on more than ten parcels without winning any bids, Defendant finally won an auction for approximately $500. Later he won another auction for approximately $25,000. After winning this bid, Defendant consistently bid until he won each of the next twelve auctions. BLM officials suspended the auction because of Defendant's actions, which had caused some legitimate bidders to leave the auction. Defendant's winning bids on the fourteen parcels of land totaled $1,797,852.25, and BLM policy required him to tender a down payment of $81,238 by 4:30 p.m. on the day of the auction. Defendant told a BLM special agent that he was unable to pay that amount. Defendant contacted a fundraiser later that day in an to attempt to raise the money, but he never completed the payment.[2]

Based on this conduct, a grand jury issued a two-count indictment against Defendant. Count 1 charged him with organizing or participating in a scheme, arrangement, plan, or agreement to circumvent or defeat the provisions of the Federal Onshore Oil and Gas Leasing Reform Act in violation of 30 U.S.C. § 195(a)(1). Count 2 charged him with making a false statement in violation of 18 U.S.C. § 1001. Prior to trial, the Government moved in limine to prevent Defendant from presenting a necessity defense. Defendant responded by filing a written proffer of the evidence he would introduce in support of a necessity defense. Defendant attached voluminous documentation of the BLM's purported violations of various environmental laws and

---

[2] Defendant asserts on appeal that he tried to make this payment but the BLM refused to accept it because the entire auction had been cancelled. This factual dispute is not relevant to the issues on appeal.

- 4 -

regulations as well as evidence about environmental issues such as global warming. The district court granted the motion in limine, concluding "the evidence is insufficient as a matter of law to support the necessity defense." United States v. DeChristopher, 2009 WL 3837208 at *5 (D. Utah, Nov. 16, 2009) (unpublished). Defendant then filed a motion for discovery regarding selective prosecution, arguing the Government treated him differently than other persons who failed to pay for their oil and gas leases. Defendant attached tables showing other successful bidders who did not pay for the leases they won. The district court denied this motion, concluding Defendant had produced no evidence of discriminatory effect. The court found no evidence showing the other persons committed similar offenses. The court also noted that Defendant won significantly more parcels and acres than the other listed bidders. The court did not reach whether Defendant had produced adequate evidence of discriminatory intent.

At trial, the Government presented the following evidence. First, the BLM employee who tended the auction registration table testified as follows: "He came in. He came up to the table. I said are you a bidder, an observer or a member of the media? He told me he was a bidder." Appellant's App., vol. II at 499. She also testified to watching Defendant read and fill out the bidder registration form. Second, the BLM employee who conducted the auction testified as to the manner in which the auction was conducted. Third, a BLM law enforcement ranger testified that his suspicions were aroused when he saw Defendant enter the auction because Defendant's age and clothing did not fit the description of most bidders. The ranger called BLM Special Agent Dan Love's attention to Defendant as someone to be watched.

Fourth, Special Agent Love testified regarding his observations of and interactions with Defendant on the day of the auction. Agent Love testified that once in the auction room, Defendant "did not seem overly concerned as to what was taking place at the auction" and "increasingly was looking . . . to the perimeter of the room, to the back of the room." Appellant's App., vol. II at 552. At that point, Agent Love grew concerned that Defendant might cause a disturbance, so he requested additional uniformed officers to enter the room. Sometime after the uniformed officers entered the room, Agent Love observed Defendant begin bidding. He testified that Defendant would only start bidding on a parcel once he saw bidders start dropping out, would bid up the price with the last remaining bidder, and would then drop out when the other bidder hesitated.

Agent Love testified that he made contact with Defendant during a recess in the auction, once Defendant had won fourteen bids. Agent Love verified that Defendant was the person listed on his bidder registration form and asked if Defendant could pay for the leases. Defendant then "wanted to know how much trouble he was in" and said he was "prepared to deal with the consequences." Id. at 572. Defendant said he was not able to pay the amount he bid on the leases. Defendant told Agent Love that he had "posed" as a bidder because he believed it was the only way into the sale. He said "his initial plan was to create a disruption or a disturbance," but that upon seeing additional law enforcement in the room, "he realized that making a disruption or speech would not have the kind of impact that he was looking for." Id. at 578. Defendant also said he made the decision to bid fraudulently on the parcels once he was in the auction. He told Agent Love that after he won the second bid, he realized he had no way to pay for the leases, so he decided to

"make a stand" and keep bidding.  Id. at 577.

Fifth, another BLM employee who assisted with the auction testified that the other bidders were very upset by Defendant's actions.  She also testified that the BLM did not immediately restart the auction after Defendant left the room because "some bidders may have already left the sale and the confidentiality is gone," which hurt the competitiveness of the auction.  Appellant's App., vol. II at 623–24.

Finally, the Government called Kent Hoffman, the BLM's Utah deputy state director for lands and minerals, who testified regarding the work involved in preparing for the lease auction.  He testified:

> A lease auction typically begins five or six months before the actual auction, where the industry nominates parcels and we receive the expression of interest, and then those expressions . . . are screened by my staff and then sent to the field office where there are environmental reviews and compliance with things like the National Historic Preservation Act, the Endangered Species Act, several other things are completed, and then prior to the auction the environmental documents are signed.

Id. at 651–52.  After Mr. Hoffman's testimony, Defendant again sought to introduce evidence the BLM violated environmental laws by offering the leases for oil and gas drilling.  Defendant argued Hoffman's testimony opened the door to such evidence.  The district court excluded the evidence, saying it "would confuse the jury and it would be misleading.  It would be in an area that is so lacking in relevance, if it is relevant, that is has the potential for being improper under Rule 403 of the Rules of Evidence." Appellant's App., vol. II at 662.  After Defendant made a written proffer of the evidence he sought to present, the court again said it was unwilling to "open[] this case into a vast exploration of oil and gas lease policy by the United States government" and the related

challenges to the auction.  Id. at 685.

The defense showed the jury a 22-minute video of the auction, which frequently panned toward Defendant and showed him bidding on a number of leases.  Defendant himself also testified.  On cross-examination, the Government questioned him regarding statements he made to the public press and read into evidence some of Defendant's public statements.  In one interview, he said, "I was there to stop that auction.  Even though I didn't have a specific plan I felt that I could be powerful enough to stop it.  And I think that mindset is what allowed me to stop it."  Id. at 827.  In another interview, he said, "I just decided I wanted to go inside to cause a bigger disruption."  Id. at 829.  In another, he said, "I had signed a piece of paper downstairs saying it was a federal offense to bid without intent to pay, but I decided I could live with those consequences, and I couldn't turn my back on this chance to make an impact."  Id. at 836.  Defendant admitted on the stand that he "posed" as a bidder and "represented" to the BLM employee at the registration table that he was a bidder.  Id. at 831.  He said he did this because he thought it was the only way to get into the auction, and he said the employee only asked if he was a "bidder," not whether he was a "bidder, observer, or member of the media."  He also admitted that after he won his second bid he "was attempting to win the leases," even though he knew he could not afford them.  Id. at 841.

Defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 at both the close of the Government's case and the close of all the evidence.  The district court denied the motion each time.  The jury then convicted Defendant on both counts.  The district court sentenced Defendant to twenty-four months'

imprisonment and three years' supervised release.[3]

## II.

Defendant appealed, raising a host of issues, some of which he did not raise below. Although he only lists three issues, we can discern eight distinct arguments on appeal. They are as follows: (1) the evidence was insufficient to convict Defendant on Count 1 because the statute requires multiple parties, (2) the evidence was insufficient to convict Defendant on Count 1 because the statute requires awareness of specific provisions of the Leasing Reform Act, (3) the evidence of Defendant's intent to bid in bad faith was insufficient to sustain Count 2, (4) the jury instructions constructively amended the indictment, (5) the district court improperly limited inquiry into the legality of the auction, (6) the district court improperly denied Defendant the opportunity to present a necessity defense, (7) the Government selectively prosecuted Defendant in violation of the Equal Protection Clause, and (8) the district court sentenced Defendant to punish him for exercising his First Amendment rights. Because the standard of review varies, we will discuss the appropriate standard under each issue.

## A.

We first address Defendant's argument that the evidence was insufficient to convict him on Count 1 because it did not demonstrate group activity. He argues 30 U.S.C. § 195(a)(1) requires more than one person, similar to a conspiracy charge. When

---

[3] The district court's judgment does not indicate whether the sentence was twenty-four months on each count, to be served concurrently, or twelve months on each count, to be served consecutively. At oral argument, defense counsel said he understood the sentence to be twenty-four months on each count.

reviewing the sufficiency of the evidence, we ask whether "a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." United States v. Diaz, 679 F.3d 1183, 1187 (10th Cir. 2012) (quoting United States v. Wilson, 107 F.3d 774, 778 (10th Cir. 1997)). Defendant did not raise this specific argument in his Rule 29 motion, meaning we review it only for plain error.[4] United States v. Schene, 543 F.3d 627, 636 (10th Cir. 2008). That standard requires Defendant to demonstrate (1) error that is (2) plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Flonnory, 630 F.3d 1280, 1288 (10th Cir. 2011). Defendant cannot meet this burden.

"An error is plain if it is clear or obvious under current, well-settled law. In

---

[4] Defendant's sufficiency argument is somewhat baffling at first glance because the jury instructions did not require group activity and Defendant never objected to the jury instructions for failing to require group activity. That is, Defendant is arguing the Government failed to prove a required element, but that element was not part of the jury instructions. Despite this awkward litigation strategy, however, Defendant is probably entitled to plain error review of his sufficiency claim. Although the question is not settled in our circuit, we have said in dicta that the measure for a sufficiency challenge is, with one limited exception, whether a *properly instructed* jury could convict, rather than whether the jury *as actually instructed* could convict. United States v. Nacchio, 519 F.3d 1140, 1157 (10th Cir. 2008), vacated in part on other grounds 555 F.3d 1234, 1236 (10th Cir. 2009) (en banc). We said in Nacchio, "[W]hen asking what facts the jury had to find in order to convict, we look to the elements of the crime *as defined by law*, except that if the government did not object to jury instructions containing additional requirements, it is required to prove those too." Id. (emphasis added). If it is proper to look to the statute, rather than the jury instructions, in weighing the sufficiency of the evidence, Defendant may challenge the sufficiency of the evidence despite his failure to challenge the jury instructions. We need not definitively decide the issue, because Defendant cannot prevail on his sufficiency claim under plain error review.

general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." United States v. Thornburgh, 645 F.3d 1197, 1208 (10th Cir. 2011) (citation and internal quotation marks omitted). Defendant cannot marshal any case law, even from other circuits, that supports his position. The lack of case law is unsurprising, given that to the parties' knowledge this is the first time the Government has prosecuted a person under 30 U.S.C. § 195(a). Nor can Defendant point us to cases interpreting similar statutes because Congress has not employed similar language elsewhere in the United States Code. Defendant argues the "purpose" of Leasing Reform Act supports his interpretation, but cites only articles, rather than legislative history. Finally, Defendant points us to two cases, neither of which have any application here. The first case, H.J. Inc. v. Nw. Bell Tele. Co., 492 U.S. 229, 244 (1989), discussed the term "organized crime," and rejected the argument that the federal RICO statute was limited to "organized crime in the traditional sense." The second case, United States v. Tejada-Beltran, 50 F.3d 105, 113 (1st Cir. 1995), interpreted the Sentencing Guidelines' use of the word "organizer." The court in Tejada-Beltran, said an organizer is "at bottom a person who forms diverse elements into a whole consisting of interdependent, coordinated parts, geared for concerted action." Id. This definition does not rule out individual activity, so it provides Defendant little help.

Nor does the statute's language unambiguously require group activity. See United States v. Brown, 316 F.3d 1151, 1158 (10th Cir. 2003) (concluding that even in "the absence of circuit precedent" a district court's error was plain when a guideline "clearly and obviously" was limited to a single interpretation). Section 195(a)(1) makes it

- 11 -

unlawful for any person "to organize or participate in any scheme, arrangement, plan, or agreement to circumvent or defeat the provisions of this chapter or its implementing regulations . . . ." The statute first requires the defendant either to "organize" or "participate." Webster's Third New International Dictionary defines "organize" as "to unify into a coordinated functioning whole: put in readiness for coherent or cooperative action," "to arrange by systematic planning and coordination of individual effort," or "to put in a state of order." Webster's Third New Int'l Dictionary 1590 (1981). It defines "participate" as "to take part in something (as an enterprise or activity) usu[ally] in common with others." Id. at 1646. Although participation is *usually* in common with others, it need not necessarily involve other persons. And a person can "organize" something entirely on one's own. So these first two words do not require group activity.

Next, the statute requires the organization or participation to involve a "scheme, arrangement, plan, or agreement." An "agreement," of course, requires two or more people. But the other three terms do not.[5] Black's Law Dictionary defines "scheme" as "[a]n artful plot or plan, usu[ally] to deceive others." Black's Law Dictionary 1462 (9th ed.). Webster's defines "arrangement" as "a structure or combination of things arranged in a particular way for a specific purpose" or "a mutual agreement or understanding (as between persons or nations)." Webster's Third New Int'l Dictionary 120 (1981). Finally, Webster's defines "plan" as "a method of achieving something: a way of

_____

[5] Defendant essentially concedes this point when he notes that Congress could have imposed individual liability by making it a crime "for a person to scheme, arrange, or plan to circumvent or defeat" the provisions of the Leasing Reform Act. Appellant's Br. at 19 n.14. He hangs his hat on the addition of the words "organize" and "participate in."

- 12 -

carrying out a design." Id. at 1729. To convict Defendant under this statute, the jury needed only to conclude that Defendant "arrange[d] by systematic planning" a scheme, plot, or plan to interfere with the provisions of Title 30, Chapter 3A. The ordinary meaning of these words does not require more than one person. In short, we cannot conclude under plain error review that the statute requires group activity. Thus, the evidence was sufficient to convict Defendant on Count 1.

## B.

Defendant next argues the evidence was insufficient because the Government presented no evidence that Defendant "was aware of any of the provisions of chapter 3A of Title 30 or the implementing regulations." Appellant's Br. at 20. Although subsection 195(a)(1) does not include the word "knowingly," the subsection that specifies the *penalty* for a violation of 195(a) applies only to persons who "knowingly violate[] the provisions of subsection (a)." § 195(b). Thus, a conviction under the statute requires a knowing violation. Defendant would read the word "knowing" to require that Defendant "sought to circumvent or defeat" at least two *specific* provisions of Title 30, chapter 3A. Jury Instruction 13 instructed the jury that "'[k]nowingly' means that the action was done voluntarily and intentionally and not because of mistake or accident." Appellant's App., vol. I at 371. Defendant objected to this instruction in the district court, and argued in his Rule 29 motion that the evidence was insufficient without proof that he knew of specific provisions of the statute. Id., vol. II at 769, 872–73. We therefore review the sufficiency of the evidence on this point de novo. Sturm, 672 F.3d at 896.

We cannot accept Defendant's argument that the statute required him to know the

- 13 -

*specific statutory or regulatory provisions* he was violating. In <u>Liparota v. United States</u>, 471 U.S. 419, 420 (1985), the Government prosecuted the defendant under a statute providing that "whoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations," 7 U.S.C. § 2024(b)(1), was subject to a fine or imprisonment. The Government in <u>Liparota</u> argued that the defendant need not know his actions were illegal, but need only know the facts that constituted the crime. <u>Liparota</u>, 471 U.S. at 423. The Supreme Court rejected this view, and held the Government must prove "that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations." <u>Id.</u> at 433. Nevertheless, the Court held that "the Government *need not show that he had knowledge of specific regulations* governing food stamp acquisition or possession." <u>Id.</u> at 434 (emphasis added). Similarly, we have held that a statute punishing a person who "knowingly enters into a marriage for the purpose of evading any provision of the immigration laws," 8 U.S.C. § 1325(c), does not require the Government "to prove the defendant knew of the *specific* immigration statute allegedly violated." <u>United States v. Islam</u>, 418 F.3d 1125, 1128 (10th Cir. 2005) (emphasis added).

Here, the Government presented the jury with ample evidence that Defendant knew his actions would "circumvent or defeat" the statutes and regulations governing oil and gas leases. This evidence included Defendant's statements that he was "there to stop that auction," that he wanted to cause a disruption, and that he intended to win leases for which he could not pay. The jury also heard that Defendant asked Agent Love how much trouble he was in and said he was prepared to deal with the consequences of his actions.

- 14 -

A reasonable jury could conclude from these facts that Defendant knew his actions would interfere with the statutory and regulatory provisions relating to oil and gas leases.

## C.

Defendant next argues insufficient evidence of his intent to bid in bad faith supported his conviction on Count 2. Because Defendant made this argument in his Rule 29 motion, we review it de novo. Sturm, 672 F.3d at 896. The false statement statute applies to a person who "in any matter within the jurisdiction of the executive . . . branch of Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a).

The jury instructions informed the jury that, to convict Defendant on Count 2, it must find "*First*, the defendant made a false statement or representation to the government when he completed and signed a 'Bidder Registration Form,' and certified that he had a good faith intention to acquire an oil and gas lease on lands offered for auction by the United States."[6] Appellant's App., vol. I at 372. Defendant argues the Government presented no evidence indicating he actually intended to bid on the leases when he signed the form. He says he only decided to bid about twenty minutes into the auction.[7] Thus, the argument goes, he did not knowingly make a false statement when he

---

[6] This instruction does not reflect the facts entirely accurately because the bidder registration form did not certify the intent to bid in good faith. It only certified that "any bid submitted" would be in good faith. Appellant's App., vol. I at 406. Defendant has not, however, challenged the instruction on this basis.

[7] Defendant's representation to the BLM employee that he was a "bidder" was, by Defendant's own admission, a false representation. The jury instructions, however, only instructed the jury regarding Defendant's action in signing the bidder registration form.

signed the form saying "any bid" he made would be a good faith bid because at that time he did not intend to bid at all. Appellant's App., vol. I at 406.

A reasonable jury could decline to credit Defendant's statements and find he intended to bid in bad faith at the time he signed the form. Defendant's testimony, and his story to Agent Love, was that he posed as a bidder because he thought it was the only way to get in and that he intended at first only to cause a disturbance in the auction. He testified that the BLM employee at the registration table only asked him if he was a "bidder." The BLM employee, however, specifically recalled asking Defendant whether he was a "bidder, observer, or member of the media." Appellant's App., vol. I at 178. Based on this testimony, a reasonable jury could conclude Defendant posed as a bidder not simply to gain entrance to the auction, which he could have done as an observer, but in order to drive up the auction prices. The jury also heard evidence that Defendant entered the auction in order to "take stronger action," to "stop that auction," and to "cause a bigger disruption." Id., vol. II at 802, 827, 829. Furthermore, a jury could conclude Defendant's very act of filling out the bidder registration form and acquiring a bidder's paddle was consistent with an intent to bid in the auction. That being so, the jury could also conclude Defendant intended to bid in bad faith because he testified he never intended to actually drill or develop the leases. Thus, the evidence was sufficient to sustain Defendant's conviction on Count 2.

D.

So, as instructed, the jury could not convict Defendant on the basis of his false statement that he was a bidder.

- 16 -

Defendant next argues the jury instructions constructively amended the indictment in two ways. First, he argues they constructively amended Count 1 by omitting the indictment's allegations (1) that Defendant "represented himself as a *bona fide* bidder when in fact he was not," (2) that Defendant completed a bidder registration form certifying his good faith intention to acquire an oil and gas lease, and (3) that Defendant "bid on and purchased oil and gas leases that he had neither the intention nor the means to acquire." Appellant's App., vol. I at 33. Second, he argues the instructions constructively amended Count 2 by allowing conviction for a "false" statement even though the indictment charged a "false and fraudulent" statement. We review de novo whether the jury instructions constructively amended the indictment. United States v. Sprenger, 625 F.3d 1305, 1307 (10th Cir. 2010).

A constructive amendment to an indictment occurs "when the evidence presented at trial, together with the jury instructions, so alters the indictment as to charge a different offense from that found by the grand jury." United States v. Farr, 536 F.3d 1174, 1180 (10th Cir. 2008) (internal quotation marks and alterations omitted). "To constitute a constructive amendment, the district court proceedings must modify an essential element of the offense or raise the possibility the defendant was convicted of an offense other than that charged in the indictment." United States v. Hien Van Tieu, 279 F.3d 917, 921 (10th Cir. 2002). Here, the three allegations omitted from Count 1 were not elements essential to the offense. Nor did the omission of these allegations result in Defendant being convicted of an offense other than that described in 30 U.S.C. § 195(a)(1). So Defendant's first argument falls flat.

Defendant's second argument is also a non-starter. The basic issue is whether the Government could charge a "false *and* fraudulent" statement, yet only prove a false *or* fraudulent statement. "It is hornbook law that a crime denounced in the statute disjunctively may be alleged in an indictment in the conjunctive, and thereafter proven in the disjunctive." United States v. Gunter, 546 F.2d 861, 868–69 (10th Cir. 1976). See also United States v. Powell, 226 F.3d 1181, 1192 n.4 (10th Cir. 2000). So the jury instructions did not amend the indictment.

E.

Next, Defendant asserts the district court abused its discretion by limiting his presentation of evidence regarding the alleged illegality of the BLM auction. Defendant sought both to cross-examine Mr. Hoffman regarding the BLM's compliance with federal laws and to introduce additional evidence, including evidence that the BLM (1) failed to provide the standard three-month notice period for the leases, (2) inadequately conducted the "normal studies" as to the environmental and archeological impact of the leases, (3) failed to comply with the National Environmental Policy Act, the National Historic Preservation Act, and the Federal Land Policy and Management Act, and (4) disregarded concerns expressed by the National Park Service and the Environmental Protection Agency. Appellant's App., vol. I at 287–89. Defendant argued in the district court that the evidence was relevant to his defense on Count 1 and that the Confrontation Clause gave him a right to meaningfully cross-examine Mr. Hoffman. The district court excluded the evidence. We ordinarily review evidentiary rulings for abuse of discretion, but to the extent Defendant asserts the exclusion of evidence violated his constitutional

- 18 -

rights, we review the ruling de novo.  United States v. Markey, 393 F.3d 1132, 1135 (10th Cir. 2004).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)) (citations omitted).  Thus, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," but "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about . . . prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  "[W]e will reverse a district court's decision excluding evidence if, but only if, the proffered evidence is both relevant and material . . . ."  United States v. Hernandez-Hernandez, 519 F.3d 1236, 1238–39 (10th Cir. 2008).

Here, the district court correctly excluded the evidence as irrelevant.  Whether the BLM complied with all applicable environmental regulations in conducting the auction has nothing to do with whether Defendant organized a scheme, arrangement, or plan to circumvent or defeat the provisions of the Onshore Leasing Reform Act relating to oil and gas auctions.  Defendant was essentially trying to present a defense akin to the equitable defenses of *in pari delicto* or unclean hands.  The statute does not allow such a

- 19 -

defense. Nor do the BLM's allegedly illegal actions negate any element of the offense. Thus, any evidence of the BLM's noncompliance with federal law or its environmental failures was irrelevant to Defendant's guilt or innocence, and the district court properly excluded the evidence.

F.

Next, Defendant argues the district court erred in preventing him from presenting a necessity defense. "A criminal defendant is entitled to an instruction on his theory of defense provided that theory is supported by some evidence and the law." United States v. Haney, 318 F.3d 1161, 1163 (10th Cir. 2003) (en banc). The Supreme Court has said it is an "open question whether federal courts ever have authority to recognize a necessity defense not provided by statute." United States v. Oakland Cannabis Buyers' Co-op., 532 U.S. 483, 490 (2001). Nevertheless, our circuit continues to assume such a defense exists. United States v. Patton, 451 F.3d 615, 638 (10th Cir. 2006). To succeed on a necessity defense, a defendant must show "(1) there is no legal alternative to violating the law, (2) the harm to be prevented is imminent, and (3) a direct, causal relationship exists between defendant's action and the avoidance of harm." United States v. Baker, 508 F.3d 1321, 1325 (10th Cir. 2007) (internal alterations and ellipsis omitted). We review a district court's refusal to instruct on a specific defense, like its decision to exclude evidence, for abuse of discretion. Id.

Here, the district court did not abuse its discretion in concluding the evidence was insufficient to support a necessity defense. We need go no further than the first prong—the absence of a legal alternative. The harm Defendant intended to prevent was the

environmental harm that would stem from the sale and delivery of the leases. One obvious legal alternative for preventing this harm was to file or join in a lawsuit to enjoin the issuance of the leases. In fact, a number of environmental groups had filed such a lawsuit two days before the sale, once they realized nothing else would halt the auction. Defendant responds that a statute required the leases to issue within 60 days following full payment by the successful bidders. 30 U.S.C. § 226(b)(1)(A). True enough, but a court could (and did) prevent the BLM from issuing the leases by issuing a temporary restraining order or injunction. See Allred, 2009 WL 765882. Because Defendant had this legal (and more effective) means of preventing the leases from issuing, he was not entitled to present a necessity defense to the jury.

## G.

Defendant's next argument is that the district court erred in denying his motion for discovery on the issue of selective prosecution. "We review de novo the district court's grant or denial of a defendant's selective-prosecution discovery motion." United States v. Deberry, 430 F.3d 1294, 1298 (10th Cir. 2005). A criminal defendant claiming selective prosecution must show "that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." United States v. Armstrong, 517 U.S. 456, 465 (1996) (internal quotation marks omitted). In order to obtain discovery concerning selective prosecution, Defendant must satisfy the "rigorous standard" of making "a credible showing" of both discriminatory effect and discriminatory intent. Id. at 468, 470.

Defendant focuses most of his argument on the newly-asserted theory that the

Government prosecuted him for the exercise of his free speech rights. Because Defendant did not make this argument in the district court, the Government argues we should apply plain error review. But we need not even reach Defendant's First Amendment argument, because it only goes to the Government's discriminatory *intent*, not to whether the prosecution had a discriminatory *effect*. Like the district court, we can resolve this case on the discriminatory effect prong. To show a discriminatory effect, Defendant may not simply point out the similarities he shares with the other unprosecuted bidders. Instead, he must show the other defendants' "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." Deberry, 430 F.3d at 1301 (quoting United States v. Olvis, 97 F.3d 730, 744 (4th Cir. 1996)). Defendant has not met this standard. The tables he submitted show only one other bidder who, like Defendant, failed to submit both a down payment and a later payment in full. That other bidder had won three parcels totaling about 1,800 acres at an auction in New Mexico. Defendant, by contrast, won fourteen parcels totaling around 22,600 acres at a Utah auction. Furthermore, Defendant submitted no evidence that the other bidder had bid with the purpose of disrupting or stopping the sale. Therefore, Defendant did not meet the threshold for discovery related to selective prosecution. The district court properly denied the motion.

H.

Finally, mixed in with his argument about selective prosecution, Defendant raises the specter of retaliatory sentencing. He claims the district court imposed a heavier sentence based on his exercise of his First Amendment rights. He bases this argument on

- 22 -

some of the district court's statements during the sentencing hearing. The court said:

> If this hadn't been a continuing trail of statements by Mr. DeChristopher about his advocacy, as he calls it civil disobedience, and that he will continue to fight, and I am prepared to go to prison, then others are going to have to be prepared to go with me, that causes me to feel under the sentencing laws before me that a term of imprisonment is required.

Appellant's App., vol. II at 964. The court also mentioned Defendant's decision to "step to any bank of microphones that he could find to give a speech . . . and advocate that it was fine for him to break the law." Appellant's App., vol. II at 963.

Defendant cites a number of cases from our sister circuits concluding that a district court may not constitutionally impose a criminal sentence "based to any degree on activity or beliefs protected by the [F]irst [A]mendment." United States v. Lemon, 723 F.2d 922, 938 (D.C. Cir. 1983). See also United States v. Rosenberg, 806 F.2d 1169, 1179 (3d Cir. 1986) ("[T]he imposition of a sentence on the basis of a defendant's beliefs would violate the [F]irst [A]mendment's guarantees."); United States v. Bangert, 645 F.2d 1297, 1308 (8th Cir. 1981). Although these cases are correct that First Amendment protections apply at sentencing, see Dawson v. Delaware, 503 U.S. 159, 168 (1992), their use of the term "based on" is susceptible to interpretations that conflict with Supreme Court precedent.

A sentencing court "has always been free to consider a wide range of relevant material." Payne v. Tennessee, 501 U.S. 808, 820–21 (1991). Thus, the Supreme Court has rejected the notion that the Constitution erects "a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." Dawson, 503 U.S. at

165. In <u>Dawson</u>, the state trial court admitted evidence regarding the beliefs of the Aryan Brotherhood, of which the defendant was a member, into the penalty phase of a jury trial. <u>Id.</u> at 162. The Supreme Court rejected the defendant's argument that the Constitution forbids the consideration of *any* evidence concerning protected beliefs or activities at sentencing. <u>Id.</u> at 164. In many cases, the Court said, "associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society." <u>Id.</u> at 166. One example of this would be membership in an organization "that endorses the killing of any identifiable group." <u>Id.</u> Nevertheless, the Court held that the admission of the Aryan Brotherhood evidence violated the First Amendment because it was "totally without relevance to [the defendant's] sentencing proceeding." <u>Id.</u> at 165. The evidence was so limited that it only tended to prove the "abstract beliefs" of the Aryan Brotherhood and the defendant. <u>Id.</u> at 166–67. The Court expressed concern that the evidence was introduced "simply because the jury would find these beliefs morally reprehensible." <u>Id.</u> at 167.

<u>Dawson</u> indicates, at the very least, that a court may impose a sentence "based on" a defendant's protected beliefs as long as those beliefs are "relevant to the issues involved." <u>Id.</u> at 164. Thus, the Fifth Circuit holds that a sentencing court may consider a defendant's beliefs if they are "sufficiently related to the issues at sentencing." <u>United States v. Simkanin</u>, 420 F.3d 397, 417 (5th Cir. 2005) (quoting <u>Boyle v. Johnson</u>, 93 F.3d 180, 183–85 (5th Cir. 1996)). The <u>Simkanin</u> court held a defendant's belief in the invalidity of federal tax laws was relevant to his tax crimes and "demonstrate[d] a likelihood of recidivism." <u>Id.</u> Similarly, the Ninth Circuit held that a district court could

impose a sentence based on the defendant's views where the court "made it clear that it was increasing the sentence based on [the defendant's] lack of remorse and his threat to . . . the public when released." United States v. Smith, 424 F.3d 992, 1016 (9th Cir. 2005). Because the need to promote respect for the law and afford adequate deterrence were "legitimate sentencing factors under 18 U.S.C. § 3553(a)," Smith held the district court could consider the Defendant's views in imposing sentence. Id.

Here, the district court considered Defendant's beliefs for relevant purposes and did not punish him for his speech. The court said, "I want to make clear that Mr. DeChristopher had every right to make every pronouncement that I know of about everything, and when he was convicted of a felony, to go out in front of this courthouse and say whatever he said. He had the right to do that." Appellant's App., vol. II at 963. And when the court imposed sentence, it noted it was "focusing primarily on respect for the law and deterrence." Id. at 966. The context makes clear that the court, far from punishing Defendant for the content of his public statements, simply relied on those statements to determine the sentence necessary to deter Defendant from future violations and to promote respect for the law. Defendant's statements that he would "continue to fight" and his view that it was "fine to break the law" were highly relevant to these sentencing factors. So the district court did not violate the First Amendment by considering Defendant's public statements when imposing sentence.

AFFIRMED.

No. 11-4151, <u>United States v. DeChristopher</u>

**BRISCOE**, Chief Judge, concurring in part and dissenting in part.

I respectfully dissent from Part II.A of the majority opinion. Of the eight arguments DeChristopher advances in this appeal, I see merit only in his contention that the evidence at trial was insufficient to convict him on Count 1 of the indictment. Consequently, I would reverse the judgment of the district court as regards the conviction on that count. I would otherwise affirm the judgment.

Count 1 charged DeChristopher with violating Chapter 3A of the Federal Onshore Oil and Gas Leasing Reform Act (FOOGLRA), 30 U.S.C. § 195(a)(1), which makes it "unlawful for any person . . . to organize or participate in any scheme, arrangement, plan, or agreement to circumvent or defeat the provisions of this chapter or its implementing regulations." 30 U.S.C. § 195(a)(1). Count 1 specifically alleged that "[o]n or about December 19, 2008," DeChristopher "did organize and participate in a scheme, arrangement, plan, and agreement to defeat the provisions of [FOOGLRA] . . . by knowingly interfering with the competitive bidding process of the sale of federal oil and gas leases." And at trial, Jury Instruction No. 13 outlined in the following manner the essential elements of this alleged offense:

> The defendant is charged in Count 1 with a violation of [FOOGLRA] by interfering with the competitive bidding process of the December 19, 2008 oil and gas lease auction. To find the defendant guilty of this offense you must be convinced that the United States has proved each of the following beyond a reasonable doubt:
>> First, the defendant knowingly organized or participated in a scheme or plan; and

Second, the scheme or plan was intended to circumvent or defeat the competitive bidding process of the sale of federal oil and gas leases.

"Knowingly" means that the action was done voluntarily and intentionally and not because of mistake or accident.

Dist. Ct. Document 65, at 15 (Instruction No. 13).

According to the majority, DeChristopher "is arguing the Government failed to prove a required element," i.e., "group activity," "but that element was not part of the jury instructions." Op. at 10 n.4. I disagree. In challenging the sufficiency of the evidence supporting his conviction on Count 1, DeChristopher argues that "[t]he statutory language of the offense [he] was charged with and convicted of describes an anticipatory or inchoate offense similar to conspiracy, the gravamen of which is multiple people consorting to evade the laws governing the auction process." Aplt. Br. at 18. More specifically, he argues that "[t]he [statutory] terms 'organize' and 'participate' refer to group or shared activity" and "would be superfluous if Congress had intended for individual liability for individual intentions to violate the law." Id. at 18-19. In turn, he argues that "[t]here was no evidence presented . . . that [he] participated, organized, or acted jointly or in concert with any other person in a scheme, arrangement, plan or agreement to defeat any law." Id. at 19.

In my view, DeChristopher's arguments are entirely consistent with, rather than foreclosed by, the language of Jury Instruction No. 13. As noted, Instruction No. 13 specifically employed the statutory words "organized" and "participated." DeChristopher is now arguing that these words, which were not defined for the jury, can

2

only be construed to encompass group activity, and that the government failed to present any evidence of group activity.[1]

Thus, in sum, the question posed by DeChristopher is whether the language of 30 U.S.C. § 195(a)(1), upon which Count 1 of the indictment and the jury instructions were based, is aimed at group activity or whether a single person acting alone can violate the statute. If proof of the latter is not enough, we must next address whether under plain error DeChristopher's conviction on count one can be upheld.

The plain language of § 195(a)(1) reveals a distinct evidentiary shortfall in the government's case against DeChristopher. Congress did not make it unlawful to "engage in conduct" that circumvents or defeats the provisions of FOOGLRA. Rather, it chose words that commonly denote group activity, both in everyday language and other statutory provisions. Here, it is undisputed that DeChristopher acted alone—a fact the government and the majority confront by twisting the common understanding of "organize" and "participate" to cover the conduct of a lone actor. This deficiency is fatal

---

[1] As the majority correctly notes, it is unsettled in this circuit whether, in resolving a defendant's sufficiency-of-evidence challenge, we look to the elements of the crime as outlined in the relevant statute, or instead to the elements as described in agreed-upon or otherwise unchallenged jury instructions. Op. at 10 n.4; see also United States v. Romero, 136 F.3d 1268, 1273 (10th Cir. 1998) ("the case law in this circuit clearly establishes that we adhere to the law of the case doctrine, whereby the Government is required to prove all elements put forth in unchallenged instructions to the jury, even if the Government would not, under law, be otherwise required to do so."). It is unnecessary to decide that question in this case because, in my view, DeChristopher prevails under either approach (indeed, it would be more beneficial to DeChristopher if we were to look only to the elements as described in the jury instructions, because they utilized only a portion of the relevant statutory language).

3

to the government's case.  Even under plain error review, I would reverse

DeChristopher's conviction on this count.

**I**

In 1987, Congress enacted FOOGLRA to reform the process for competitively

awarding and administering oil and gas leases on federal lands.  See Pub. L. 100-203, 101

Stat. 1330.  The enforcement provision of the law makes it "unlawful for any person . . .

to organize or participate in any scheme, arrangement, plan, or agreement to circumvent

or defeat the provisions of this chapter or its implementing regulations."  30 U.S.C. §

195(a)(1).  The following subsection provides that "[a]ny person who knowingly violates

the provisions of subsection (a) of this section shall be punished by a fine of not more

than $500,000, imprisonment for not more than five years, or both."  Id. § 195(b).  What

evidence is required to support a conviction under FOOGLRA is a matter of first

impression before the federal courts, and, as a consequence, our interpretation of the

statute and the proofs required to sustain a conviction under it have the potential to affect

more than just DeChristopher's prosecution.

DeChristopher argues that the plain language of the statute requires the

government to prove that he and at least one other person "shared the goal" of defeating

or circumventing specific, known provisions of chapter 3A of Title 30.  Aplt. Br. at 19-

20.  The government contends that we must review this argument under the plain error

standard because DeChristopher did not present it to the district court.

I agree with the majority and the government that we must apply plain error review

4

to this argument because DeChristopher failed to raise it in the district court.[2]  Under the plain error standard, DeChristopher has the burden of demonstrating: (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.   United States v. McGehee, 672 F.3d 860, 876 (10th Cir. 2012).  The error generally must be "clear or obvious under current law." United States v. Brown, 316 F.3d 1151, 1158 (10th Cir. 2003) (quotation omitted).  But "the absence of circuit precedent does not prevent the clearly erroneous application of statutory law from being plain error."  Id. (quotation and brackets omitted).

Of course, little about this case of first impression is "clear or obvious."  The parties are unaware of any previous prosecution under § 195(a) since it was enacted in 1987.  And I agree with the majority that this seems to have been the first.  But even in the absence of precedent, I would still conclude plain error is established here because the acts alleged and presumably found by the jury do not fall within the scope of the statute.

In interpreting federal statutes, "we first and foremost look to the statute's language to ascertain Congressional intent," giving words their ordinary and plain

---

[2] DeChristopher vigorously contests forfeiture by arguing that he raised this issue in his proposed jury instructions, motion to dismiss, testimony on his own behalf, and defense counsel's opening and closing statements to the jury.  But one strains to find even the most oblique references at trial to the group-activity argument now raised.  The closest defense counsel came to raising the argument came during closing argument, where he argued that DeChristopher "didn't have a plan with other people that he had conspired with . . . to go down [to the auction] and do anything."  Aplee. Supp. App. at 7-8.  Even viewed in the most charitable light, DeChristopher never gave the district court the opportunity to directly address whether evidence of group activity was required.

5

meaning.  United States v. West, 671 F.3d 1195, 1199 (10th Cir. 2012).  If the terms of the statute are clear and unambiguous, the inquiry ends and we simply give effect to the plain language of the statute."  United States v. Sprenger, 625 F.3d 1305, 1207 (10th Cir. 2010) (quotation omitted).  "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 243 (1989) (quotation omitted).  "In such cases, the intention of the drafters, rather than the strict language, controls."  Id.

Again, the statute makes it "unlawful for any person . . . to organize or participate in any scheme, arrangement, plan, or agreement to circumvent or defeat the provisions of this chapter or its implementing regulations."  30 U.S.C. § 195(a)(1).  The plain language of the statute suggests that it targets action taken in concert with others to defeat or circumvent FOOGLRA or its implementing regulations.  Both verbs selected by Congress—"organize or participate"—indicate group activity.  See Oxford English Dictionary (online; March 2012) (defining "organize," inter alia, as "[t]o coordinate or manage the activities of (a group of people)," or "to plan organized action"); id. (defining "participate" as "[t]o take part; to have a part or share with a person").  The four potential objects of the action—"any scheme, arrangement, plan, or agreement"—also suggest group activity, although not as compellingly.  Id. (defining "scheme" as a "plan of action devised in order to attain some end; a purpose together with a system of measures contrived for its accomplishment"); id. (defining "arrangement" as "[d]isposition of

6

measures for the accomplishment of a purpose; preparations for successful performance"); id. (defining "plan" as an "organized (and usually detailed) proposal according to which something is to be done; a scheme of action; a strategy; a programme, schedule" or "an offensive strategy; a scheme to defeat, capture, or prevail over someone or something, or a method of achieving this"); id. (defining "agreement" as a "coming into accord; an arrangement between two or more persons as to a course of action"). Congress's use of these terms in other statutes suggests it understands these verbs apply to actions involving more than one person. For example, it is unlawful to travel interstate with intent "to organize, promote, encourage, participate in, or carry on a riot." 18 U.S.C. § 2101(a). More benignly, federal law authorizes the administrator of the Federal Emergency Management Agency "to organize, or to participate in organizing, an annual conference on fire prevention and control." 15 U.S.C. § 2213. In these and various other contexts, organizing and participating suggest either concerted action by more than one person—such as a riot—or individual acts bearing on some group activity—such as coordinating a conference.

Even if reasonable minds could disagree on the plain meaning of "organize" and "participate," application of FOOGLRA's enforcement provision on these facts would "produce a result demonstrably at odds with the intentions of its drafters." Ron Pair Enters., 489 U.S. at 243. On this point, we are not without helpful guidance from legislative history, which elucidates whatever the plain language leaves unclear.

The civil and criminal penalties provided in FOOGLRA's enforcement provision

7

were intended to curtail a proliferation of fraud and abuse by private parties in the government's leasing of oil and gas rights on federal lands. See H.R. Rep. No. 378, 100th Cong., 1st Sess. 15 (1987) (explaining that enforcement provision is intended to "combat fraud and abuse of the federal oil and gas leasing program"); S. Rep. No. 188, 100th Cong., 1st Sess. 1 (1987) (listing as one purpose of reform legislation the need to "strengthen the Federal authority to stop certain unlawful practices with respect to mineral leasing engaged in by private parties" (emphasis added)). The house report documented specific forms of fraud that had arisen in the industry:

> Fraud and abuse has long been associated with the lottery used to issue the vast majority of leases on a noncompetitive basis. On occasion, the system has been subject to manipulation and due to continuing deficiencies in making geological determinations relating to oil and gas structures, lands which should have been issued by competitive leasing to the highest bidder were instead issued noncompetitively for a minimal filing fee. Another major problem involves the so-called "40 Acre Merchants" who obtain leases which contain no known oil or gas resources, divide them into parcels of less than 40 acres, and peddle them using false promises of high return to unsuspecting citizens. . .
>
> Due to these situations, there currently exists uncertainty over whether the noncompetitive leasing system can withstand fraud and abuse . . . .

H.R. Rep. No. 378, 100th Cong., 1st Sess. 15 (1987). A report of the Senate Committee on Energy and Natural Resources explained that, before FOOGLRA, "the Federal onshore oil and gas leasing program ha[d] been criticized for . . . speculation by third parties that engaged in fraudulent activities." S. Rep. No. 188, 100th Cong., 1st Sess. 2 (1987). Specifically, "[c]ertain companies ha[d] engaged in misrepresenting to the public

8

the chance of winning leases, the value of the leases, and the likelihood of industry interest in buying leases from members of the public should they win leases in the lottery," and "[a]dministrative remedies imposed by [the Department of Interior] . . . ha[d] reduced but not eliminated [these] fraudulent and speculative activities." Id. at 3.

This legislative history suggests this unusual statutory language was carefully chosen to address a specific problem: oil and gas industry insiders were using their expertise to exploit the weaknesses of the laws then applicable to oil and gas leasing. Considering this is a case of first impression in an area that sees little federal litigation, the majority's failure to consult legislative history is puzzling. Both the legislative history and contemporary scholarship support my view that Congress intended § 195(a)(1) to combat fraudulent industry practices by groups of insiders. One pair of scholars explained that this subsection of FOOGLRA's enforcement provision made it "unlawful to 'organize or participate in' any sort of group activity to get around the provisions" of oil and gas leasing laws.[3] Thomas L. Sansonetti & William R. Murray, A Primer on the Federal Onshore Oil and Gas Leasing Reform Act of 1987 and its Regulations, 25 Land & Water L. Rev. 375, 414 (1990) (emphasis added). Of all the legislative and scholarly sources to discuss FOOGLRA's enforcement provision, none

---

[3] These commentators also explained that the enforcement provision in § 195(a)(1) was "intended to give teeth to the drive for integrity in the leasing process of the nation's oil and gas lands." Sansonetti & Murray, supra, at 414. Additionally, a leading treatise explains that Congress added the enforcement mechanism "to combat the fraud allegedly prevalent under the simultaneous leasing system." George Cameron Coggins & Robert L. Glicksman, Public Natural Resources Law § 39:20 (2d ed. 2012).

9

suggested it was intended to proscribe anything other than fraud by industry insiders who knew the law and sought to exploit its vulnerabilities through concerted action.

In my view, it is inconsistent with the statutory text and congressional intent, and ultimately clearly erroneous, to apply § 195(a)(1) to DeChristopher's acts. Cf. Williams v. United States, 458 U.S. 279, 287 (1982) ("Absent support in the legislative history for the proposition that § 1014 was 'designed to have general application to the passing of worthless checks,' we are not prepared to hold petitioner's conduct proscribed by that particular statute." (citation omitted)). The correct reading of the statute is not subject to reasonable disagreement; the group activity requirement is compelled based on the plain wording of the statute. See United States v. Ruiz-Gea, 340 F.3d 1181, 1187 (10th Cir. 2003). Because the statute of conviction requires group activity, and because it is undisputed that DeChristopher acted alone, DeChristopher was convicted based on insufficient evidence of guilt. All four prongs of the plain error test are satisfied in this case because "a conviction in the absence of sufficient evidence of guilt is plainly an error, clearly prejudiced the defendant, and almost always creates manifest injustice." United States v. Goode, 483 F.3d 676, 681 n.1 (10th Cir. 2007) (footnote adopted by the court en banc).

Given the legislative history of FOOGLRA's enforcement provision, there can be no doubt that Congress was targeting boiler-room operations run by scheming oil and gas speculators, not the actions of a solitary intermeddler at an auction. If Congress passed § 195(a)(1) to make actions such as DeChristopher's unlawful, "it did so with a peculiar

10

choice of language and in an unusually backhanded manner." <u>Williams</u>, 458 U.S. at 287.

Even under the plain error standard, DeChristopher's conviction for violation of §

195(a)(1) cannot be upheld in the absence of proof of group activity.

### III

I would reverse the judgment of the district court as regards the conviction under §

195(a)(1).  I would otherwise affirm the judgment.